### Brian BORNEMAN and Melissa Borneman Plaintiffs,

v.

### PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation, and The Principal Select Savings Plan for Employees, a retirement plan, Defendants.

#### No. 4:02–CV–90334.

United States District Court, S.D. Iowa, Central Division.

Nov. 25, 2003.

Jaki K. Samuelson, Esq., and Steven D. Marso, Esq., Des Moines, Iowa, for Plaintiff.

Michael A. Giudicessi, Esq., Des Moines, Iowa, Steven L. Severson, Esq., Minneapolis, MN, and Amy J. Mills, Des Moines, Iowa, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiffs Brian and Melissa Borneman filed this action on July 12, 2002, alleging various claims against Defendant Principal Life Insurance Company ("Principal") and Defendant The Principal Select Savings Plan for Employees ("Plan") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq. Plaintiff Brian Borneman was an employee of Defendant Principal and a participant in the Plan. Plaintiff Melissa Borneman is Brian Borneman's wife and was a beneficiary under the Plan. Their claims arise from Principal's imposition on Plan participants of a restriction on market timing trading within the investment accounts provided by the Plan. Specifically, Plaintiffs have asserted claims under 29 U.S.C. § 1132(a)(1)(B) for recovery of benefits under the Plan, under 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3) for breach of fiduciary duty and invalidation of the market timing trading restriction, under 29 U.S.C. § 1140 for retaliation and interference, and under 29 U.S.C. § 1132(c) for failure to supply plan documentation.

On August 18, 2003, Defendants moved for summary judgment on all of Plaintiffs' claims. On September 26, 2003, Plaintiffs submitted an opposition to Defendants' motion, and requested that the Court grant summary judgment to Plaintiffs on each claim.[1] The Defendants submitted a

---

1. Plaintiffs did not formally cross-move for summary judgment. In their resistance, Plaintiffs "ask[ed] that the court grant judgment to Plaintiffs on all of their claims, which would require a trial only on the damages, issue, since the compelling undisputed material facts support judgment in their favor. *Brown v. American Life Holdings, Inc.*, 64 F.Supp.2d 882, 891 (S.D.Iowa 1998) (grant-

reply brief on October 17, 2003, and oral argument was held on October 30, 2003. The matter is fully submitted. For the reasons detailed, below, the Court grants Defendants' motion in part and denies it in part, and grants Plaintiffs' motion in part and denies it in part.

## I. FACTS

Plaintiff Brian Borneman began working for Principal in 1994. During the time period relevant to this action, approximately the beginning of 2001 until November of 2001, Mr. Borneman worked as an assistant product development consultant in Principal's Product Development Department. The Product Development Department is part of Principal's Retirement and Investor Services ("RIS") division.

Defendant Principal maintains the Principal Select Savings Plan for Employees, which is a 401(k) plan, for its employees. Principal plays multiple roles within the context of the Plan. Principal is the Plan's sponsor and administrator. The Plan is funded through a group annuity contract ("GAC") issued by Principal, which also makes Principal the Plan insurer and investment manager. As an insurance company, Principal issues group annuity contracts to fund its clients' retirement plans. Principal in its role as an employer is one of the clients who uses Principal in its role as an insurer and investment manager to fund its employee retirement plan. In these contracts, Principal agrees to pay benefits to a retirement plan's participants and beneficiaries in a manner consistent with the employer's plan. The assets backing Principal's contractual promises with its clients are invested in various separate accounts, which function much like mutual funds. In a 401(k) plan, which is the type of plan that Plaintiff Brian Borneman participated in during his employment with Principal, the individual plan participants direct their contributions to specific separate accounts. Each separate account has a specific investment focus. During the time period relevant to this action, Principal maintained six separate accounts that focused on international equities. The benefits due to individual plan participants are based on the returns associated with the separate accounts they have selected.

During the second half of 2000, Principal began to see high fluctuations of cash flow in the separate accounts. Toward the end of the year, Principal came to the conclusion that market timing trading was a factor in the fluctuations it was seeing. Market timing trading, in essence, involves short-term trades between domestic and international separate accounts. Shares in Principal's separate accounts are repriced at 4:00 PM Eastern Standard time each day, the time that the U.S. stock market closes. When a participant in Principal's 401(k) plan purchases shares in a separate account during the day, the participant does so at the price prevailing at 4:00 PM. The 4:00 PM prices are calculated on the basis of the last traded price of the stocks in that fund. The prices for the international separate accounts are among those that are recalculated at 4:00 PM, however by this time the Japanese and European markets have already been closed for some time.

In an internal study, Principal found that the performance of its international separate accounts on any given day was

---

ing judgment to non-moving party who resisted moving party's motion for summary judgment)." The Court notes that cross-moving for summary judgment by resisting the moving party's motion alone, without submitting a formal cross-motion, is disfavored. However, since the issues were fully briefed by the parties and oral argument held, the Court will deem Plaintiffs' resistance a cross motion and will consider it as such.

highly correlated with the performance of the NASDAQ on the previous day, meaning that the NASDAQ's performance on any one day could be used, albeit perhaps imperfectly, as a predictor of what would happen in the international separate accounts on the following day. The correlation between the domestic markets and Principal's international separate accounts provided the opportunity for low-risk arbitrage between the domestic and international separate accounts. A participant could look for an increase in the NASDAQ or another domestic market index, then purchase shares in one of the international separate accounts that day. The participant would buy in at the price reflected at 4:00 PM, after the relevant international markets had already closed and before the international markets had responded to the NASDAQ increase. Because of the correlation between the NASDAQ and the international separate accounts, the likelihood was that the foreign markets would increase the next day, the value of the investor's investment from the previous day would rise, and the investor would then sell the international shares to capture the gain and move his or her money back to domestic investments to await another opportunity to invest internationally. As Principal did not charge fees for transfers between the separate accounts, a participant would not incur costs as a result of these trades.

As will be discussed in more detail below, Principal decided that market timing trading was having a negative impact on the performance of its international separate accounts. To deal with this issue, Principal decided to take steps to limit market timing trading in the separate accounts of its various plans. The plan document that governs the Plan provides that Plan participants can direct contributions and order transfers "to the extent permitted by the ... [GAC]." In a Separate Account Investment Rider, which is a part of the GAC, there is language expressing that Principal in its capacity as investment manager "reserve[s] the right to defer or stop your ability to direct Contributions and transfers to a Separate Account." It was this language upon which Principal relied as authority to impose the market timing trading restriction.

In order to implement the limitation, Principal first identified the corporate clients and individual participants who were engaged in market timing trading. As of January 2001, Principal had identified among its clients, not simply within the Plan it sponsored for its own employees, 36 plan sponsors and 80 individuals who were engaged in market timing trading. The company sent each of the affected plan sponsors a letter indicating that it included members who had initiated an excessive number of one-day transfers between domestic and international separate accounts. The letter asked each sponsor to voluntarily control the activity, and indicated that if the market timing did not stop Principal would enforce new guidelines limiting member transfers involving international separate accounts to $30,000 per day.

Plaintiff Brian Borneman was one of the individuals who was identified as having engaged in market timing trading within the separate accounts of the Plan. Plaintiff became aware of the correlation between domestic market indices and Principal's international separate accounts after a market professional apprised him of the connection between international economies. Plaintiff began engaging in market timing trading around September or October of 2000. Market timing trading was very profitable for Mr. Borneman. He claims that during the first four months of 2001 he earned approximately an 11% return on his account, in a market that was down 20 to 25%. In February of 2001,

Plaintiff and other members of his department received an e-mail explaining that Principal, in its role as investment manager to the Plan, was asking some of its customers to stop excessive market timing trading by participants in their plans. The e-mail indicated, among other things, that market timing trading increased the cost of portfolio management, increased brokerage transaction costs, and decreased investment performance for all individuals using the particular investment option being traded in this manner. Attached to the e-mail was a sample letter to customers, which indicated that if the activity did not stop, Principal would restrict market timing trading for each plan participant to $30,000 per day. This e-mail was not sent to Plaintiff in his capacity as a Plan participant and it did not expressly call upon him to take any action with respect to his own market timing trading. Plaintiff continued market timing trading after receiving this correspondence.

In the spring of 2001, in order to comply with Principal's request to voluntarily limit employee market timing trading, Tammy DeHaai, who acted as Plan Administrator for Principal, obtained a list of Plan participants who were engaged in market timing trading. Brian Borneman was one of the individuals identified. DeHaai then contacted the identified employees' managers and asked them to discuss market timing trading with those employees. On April 27, 2001, Joni Tibbetts, the officer in charge of Plaintiff's department, met with Plaintiff to discuss market timing trading. She requested that Plaintiff voluntarily discontinue his market timing trading activity, and indicated that if the market timing trading activity did not stop Principal would impose a $30,000 daily limit on transfer to the international separate accounts. Plaintiff continued market timing trading after this meeting.

Principal continued to monitor those clients and individuals who had been market timing trading in order to ascertain whether there had been voluntary compliance with the request to curtail market timing trading. For those clients who were unable to stop market timing trading within their plans, including Principal in its role as employer and plan sponsor, Principal as investment manager imposed a computer restriction in early June of 2001 that limited Plan participants to trading $30,000 per day in the international separate accounts. At the point at which the official limitation was imposed, Tibbetts, Natalie Bachman, Plaintiff's supervisor, and Chris Bowman, the head of Plaintiff's division, met with Plaintiff to communicate to him that effective immediately one-day transfers to the international separate accounts would be limited to $30,000 per day. They gave Plaintiff a memo that stated that Plaintiff would be fired if he violated the new limitations. After this time, Mr. Borneman complied with the $30,000 limit.

After engaging in discussions with management about his market timing trading, Plaintiff was subsequently given a poor performance review, placed on written warning in August of 2001, placed on final warning in October of 2001, and ultimately terminated as part of a reduction in force ("RIF") by Principal in November of 2001.

## II. SUMMARY JUDGMENT

### A. The Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if the dispute over it might affect the outcome of the suit under the governing law. *Id.*

The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), 56(e); *Celotex Corp.*, 477 U.S. at 322–323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. The role of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 794 (1st Cir.1992) (citations omitted). In order to survive a motion for summary judgment, the nonmoving party must present enough evidence for a reasonable jury to return a verdict in his or her favor. *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505.

On a motion for summary judgment, the Court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *United States v. City of Columbia*, 914 F.2d 151, 153 (8th Cir.1990). The Court does not weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

### B. Recovery of Benefits under the Plan

Plaintiffs claim, pursuant to 29 U.S.C. § 1132(a)(1)(B), that Principal and the Plan have denied benefits due to them under the Plan by restricting market timing trading in contravention of the Plan's terms. The benefits denied, Plaintiffs allege, include lost past and future investment earnings under the Plan; presumably, return on market timing trading over $30,000 per day that Plaintiff Brian Borneman could have engaged in had the market timing trading restriction not been imposed.

In their motion for summary judgment, Defendants offer four arguments in support of granting judgment as a matter of law against Plaintiffs on this claim: 1) Principal as investment manager properly exercised its reserved authority under the GAC to restrict market timing trading; 2) Principal as Plan Administrator reasonably interpreted the plan documents as permitting Principal as investment manager to restrict market timing trading; 3) even if the Plan Administrator's reading of the plan documents was not the only possible interpretation, the Administrator did not abuse its discretion in interpreting the documents to permit a restriction on market timing trading; and 4) even if the plan documents did not permit the market timing trading restriction, Principal's fiduciary obligations would still have required it to limit such activity.

The Court notes at the outset that the mandatory restriction on market timing trading was not instituted until early June of 2001. It is undisputed that, although Principal as Plan Administrator and em-

ployer of Mr. Borneman requested as early as April of 2001 that Mr. Borneman voluntarily restrict or discontinue his market timing trading, Mr. Borneman in fact continued market timing trading until approximately June 14, 2001, at which time Principal in its role as investment manager imposed the mandatory $30,000 per day restriction on market timing trading on all employees who participated in Principal's 401(k) plan. The restriction of which Plaintiffs complain then, did not take effect until June 2001. The only relevant time period for purposes of Plaintiffs' claim for benefits under the Plan, then, is the period after June 14, 2001, when the restriction was actually imposed on Mr. Borneman. Before that time, there was no mandatory restriction in place to prevent Mr. Borneman from making trades greater than $30,000 per day in and out of the international separate accounts, and the undisputed evidence indicates that Plaintiff did indeed continue making such trades during the time between April and June of 2001.

### 1. Principal as Investment Manager

█ The first question the Court addresses is whether Principal in its role as investment manager had the authority to impose the market timing trading restriction on participants and beneficiaries of the Plan. Defendants argue that subsection G.2 of the Separate Account Investment Rider appended to the GAC gave it such authority. Section G provides that Principal as investment manager "reserve[s] the right to defer or stop your ability to direct Contributions and transfers to a Separate Account, and we may require you to transfer existing account balances out of a Separate Account." The four subsections under section G delineate the conditions under which Principal can exercise this authority. Defendants argue that subsection 2 is the relevant one for purposes of this litigation. Subsection 2 provides that Principal can exercise its authority to defer or stop contributions or transfers if it "believe[s] it would be imprudent not to do so in fulfilling our fiduciary role as an investment advisor under ERISA."

The Court will address the general "defer" and "stop" language of section G and the language of subsection 2 separately. The Court acknowledges and will discuss below Defendants' argument that Principal's decision as Plan Administrator to impose the market timing trading restriction is entitled to review under an abuse of discretion standard because the Plan Administrator is vested with the discretion to construe and interpret provisions of the plan, even where they are ambiguous. *See Cash v. Wal–Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir.1997). There is, however, no argument that the decision of Principal as investment manager to impose such a restriction is entitled to review under the more lenient abuse of discretion standard. The language of the plan document clearly provides that it is the Plan Administrator only who has the right to construe provisions of the Plan.[2] The Plan Administrator is defined in the plan as the employer. Although Defendant Principal wears multiple hats in the context of this ERISA plan,[3] its roles must be separated for analytical purposes. Principal in its role as investment manager is not the

---

**2.** Section 9 of the plan document provides that "the Plan Administrator has complete discretion to construe or interpret provisions of the Plan, including ambiguous provisions."

**3.** The parties agree that Principal is, *inter alia*, an employer, as defined by 29 U.S.C. § 1002(2), a plan administrator, as defined by 29 U.S.C. § 1002(16)(A), a plan sponsor, as defined by 29 U.S.C. § 1002(16)(B), a plan fiduciary, as defined by 29 U.S.C. § 1002(21), and plan insurer.

entity who has discretionary authority to construe the Plan's provisions. Consequently, its decision to impose market timing trading is reviewed *de novo*. *Cash*, 107 F.3d at 640–41 ("ERISA itself does not specify a standard of review; however, the Supreme Court has held that a reviewing court should use a *de novo* standard of review unless the plan gives the 'administrator or fiduciary discretionary authority' to ... construe the terms of the plan." (citations omitted)). "In the de novo review of an ERISA plan, we interpret the terms of the plan by 'giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.'" *Hughes v. 3M Retiree Med. Plan*, 281 F.3d 786, 790 (8th Cir.2002) (quoting *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir.1996).

### a. "Defer or stop"

Plaintiffs argue that the "defer or stop" language of section G does not give Defendants the authority to limit the amount of money with which a plan participant can engage in market timing trading. Defer, they argue, is consistently defined within the GAC as referring to the timing of trading, rather than the amount being traded. The Court is inclined to agree that the word "defer" does not, based on the evidence in the record, aptly describe Principal's action in restricting trading over $30,000 per day. The word stop, however, does. Plaintiffs argue that because the $30,000 restriction does not stop trading altogether, it is not an appropriate restriction under the language of section G of the GAC. However, the $30,000 restriction does in fact stop trading. Specifically, it stops trading in the international separate accounts in amounts exceeding $30,000 per day.

The Court finds Plaintiffs' argument that Principal should have used a word such as "limit" or "restrict" in section G if it had intended to allow a restriction such as the one imposed on market timing trading unpersuasive. First, Principal *did* use a variation of the word restrict in the heading of section G: "Deposits to Separate Accounts; *Restrictions* and Order of Entry." (emphasis added). Second, Plaintiffs argue that the plan document and the GAC were intended to allow participants the freedom to select the investments each participant decided were most appropriate for his or her individual needs, and that this intended flexibility is an indication that the "defer or stop" language cannot authorize the imposition of the market timing trading restriction. This argument defies logic, as the defer or stop language in section G, whether or not it authorizes a restriction on market timing trading, certainly recognizes the authority of Principal in its role as investment manager to control the trading of Plan participants in some manner. The flexibility that Plaintiffs argue inheres in the Plan is not without limitation. Consequently, an argument that asserts, based on the Plan's intended flexibility for participants, that any type of restriction on participant contributions is invalid is completely inconsistent with the defer or stop language of section G.

In fact, Plaintiffs' flexibility argument cuts the other way. Here, rather than carving out a much broader limitation than it thought necessary to comply with its fiduciary duty to beneficiaries and participants of the Plan, Principal instead attempted to allow employees trading in the international separate accounts some flexibility in continuing to do so, within certain boundaries established by Principal in its role as investment manager. Thus, Principal's solution to the market timing trading issue, restricting trading over $30,000 per day, accords more closely with the goals of the Plan as defined by Plaintiffs than does

a rule completely prohibiting any and all market timing trading, which Plaintiffs seem to argue *would* be authorized under the "defer or stop" language of the GAC. Consequently, a reasonable participant who understood the Plan as providing a measure of flexibility would presumably understand the language of section G to mean that if Principal felt a fiduciary responsibility to stop trading in some way, it would be authorized to do so in the least restrictive way possible within the bounds of the "defer or stop" language.

Despite Plaintiffs' argument to the contrary, it is of no consequence whatsoever that the drafter of the disputed language in the GAC did not specifically have market timing trading in mind when drafting the language. In section G, Principal did not reserve for itself the authority to defer or stop certain categories of trading activities. Rather, it reserved for itself the right to defer or stop contributions or transfers in four specifically delineated situations. The fact that Principal was not aware of market timing trading at the time the GAC was drafted does not mean that the GAC's provisions cannot be used to limit market timing trading, if such a limitation falls within the plain language of the provision.

In summary, the Court believes that a reasonable Plan participant would have understood Principal's reservation of the right to "stop" trading in section G as including the right to partially stop trading, including, as was done here, to stop trading over a certain dollar level.

### b. *Fiduciary Duty to Restrict Market Timing Trading*

The second portion of the clause that Defendant Principal contends allowed them to impose the market timing trading restriction provides that direction of contributions or transfers can be "defer[red] or stop[ped]" if Principal "believe[s] it

would be imprudent not to do so in fulfilling our fiduciary role as an investment advisor under ERISA." As discussed in the previous section, Plaintiffs have argued that the "defer or stop" language contained in the GAC does not itself permit a restriction or limitation on market timing trading. Plaintiffs premised their entire opposition to summary judgment on this claim on the "defer or stop" limitation, indicating that subsection 2 of section G is "immaterial to this motion because it applies only if Defendants have the right to impose the limitation, which they do not." Plaintiffs indicated that they would not address subsection 2, but that they did not concede any legal argument or factual assertion made by Defendants with respect to subsection 2.

Under ERISA, Principal acting in its capacity as an investment manager to the Plan is clearly a fiduciary. 29 U.S.C. § 1102(21)(A) ("a person is a fiduciary with respect to a plan to the extent ... he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets" or "renders investment advice for a fee ... with respect to any moneys or other property of such plan"). ERISA holds fiduciaries to a prudent person standard of care and requires that fiduciaries discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and, *inter alia*, for the exclusive purpose of providing benefits to participants and their beneficiaries and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1). The prudent person standard mandated by § 1104(a) is an objective standard that fo-

cuses on the fiduciary's conduct preceding a challenged decision. *Roth v. Sawyer–Cleator Lumber Co.,* 16 F.3d 915, 917–918 (8th Cir.1994) (citations omitted). To say a decision is objectively reasonable "require[s] taking into account everything that the trustees *should have known* at the time of their decision." *Id.* at 919 (emphasis in original) (citations omitted). As a fiduciary, Principal has a duty to act in the best interests of all plan participants and beneficiaries, not simply a duty to act in the best interests of each individual plan participant or beneficiary. *Varity Corp. v. Howe,* 516 U.S. 489, 514, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) ("The common law of trusts ... requires a trustee to take impartial account of the interests of all beneficiaries.").

In support of summary judgment, Defendants have pointed to deposition testimony from Principal executives indicating that portfolio managers reported high fluctuations in cash flow in the second half of 2000 in the separate accounts. The portfolio managers reported increased transactions costs and reported that they were having to maintain a high level of liquidity within the accounts to deal with the additional costs. Additionally, because they had to maintain a high level of cash on hand, their portfolios were not fully invested. When the market is going up, a portfolio will not get as much return on cash as on securities, so holding a large amount of cash can be detrimental to the performance of a separate account. Plus, portfolio managers would occasionally be forced to sell shares at less than optimal prices in order to get the cash to make the transactions that were being requested by individual clients in the separate accounts.

In the fourth quarter of 2000, approximately four to six months before requesting that Brian Borneman voluntarily discontinue market timing trading and approximately seven months before imposing the market timing trading restriction, Principal came to the conclusion that market timing trading was a factor in the high fluctuation of cash flows in the separate accounts. At this time, a group of Principal executives discussed Principal's options with respect to market timing trading. Three plans were discussed: 1) instituting a lockout period, such that once a plan participant had made a transaction within the separate accounts, further transactions would be unavailable for a certain time period after the transaction (specifically, Principal discussed a 30– or 60–day lockout period); 2) charging high fees for the transactions, while continuing to allow the trading to take place; and 3) putting a dollar limit on market timing trading within the separate accounts. Principal decided not to implement either of the first two options. A lockout period, it feared, would discourage transactions and make its product appear less attractive to employers who wanted to give employees the freedom to invest money as they chose. It decided against the fees for transactions systems because of the costs and complexity associated with implementing such a system, which Principal did not already have in place. In making the decision to implement a $30,000 trading limit, Principal looked at the actions of peer and competitor institutions for guidance.

There is undisputed testimony in the record that Principal believed that market timing trading was having a detrimental effect on the performance of its separate accounts. In a confidential e-mail sent in February, 2001, Principal's Media Relations Manager indicated that "[m]arket timing is not illegal, but it creates cash flow problems for the money managers, costs for us and most important, performance drain (10% drain on accounts)—meaning the activity of a select few is

negatively impacting all other plan members' performance." Additionally, Defendants presented deposition testimony from one of Principal's vice presidents that market timing trading was hurting non-market timing trading employees who invested in Principal's plans. Other courts have recognized the deleterious effects of market timing trading on a fund designed for long-term investment. *See Windsor Securities, Inc. v. Hartford Life Insurance Co.*, 986 F.2d 655, 658, 665–66 (3rd Cir.1993); *First Lincoln Holdings, Inc. v. Equitable Life Assurance Society of the United States*, 164 F.Supp.2d 383, 389–90 (S.D.N.Y.2001).

Additionally, Defendants have appended to their summary judgment pleadings an article from April 2001 from Mutual Fund Market News, entitled "Insurers Try to Work with Market Timers." Published approximately two months before Principal imposed mandatory market timing trading restrictions on its clients, the article helps to clarify the context in which Defendant Principal was acting in order to determine whether its actions qualify as those of a prudent person under 29 U.S.C. § 1104(a). The article indicates the "dilemma" of insurance companies who want to provide flexibility to investors:

> [W]hen excessive trading in and out of variable annuity sub-accounts occurs, both sides get frustrated. In many cases, managers are forced to sell securities to meet sizeable redemptions, and then must rush to reinvest those same assets when they come back into the fund a few days later. Fund expenses related to an increased volume of trades can quickly drag down performance. And, assets repeatedly moving in and out of a fund can seriously disrupt a fund manager's investment strategy.

Defendants also produced a letter dated June 15, 2001 from Oppenheimer Funds, which is addressed "Dear Financial Advisor" and goes on to note that the company has

> experienced a substantial increase in short-term trading activities in the mutual funds managed by our global equity team. This has resulted in large day-to-day changes in the cash positions of the relevant funds. Short-term money movements make the funds' portfolio managers reluctant to invest cash, which can negatively impact the respective fund's performance. Similarly, investing cash but then redeeming portfolio securities to satisfy redemptions caused by short-term money movements forces the funds to incur additional brokerage costs, to the detriment of long-term shareholders.

This letter is dated just a few days after Principal imposed its market timing trading restriction and, as such, is reflective of what was going on in the mutual fund market around the time the restriction was imposed. Such information helps to shed light on whether the phenomenon of market timing trading carried the negative consequences that Defendants have alleged it did and whether Principal's response was in accordance with their fiduciary duty under § 1104(a).

A plaintiff making a claim under § 1132(a)(1)(B) bears the burden of proving an entitlement to plan benefits. *See Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir.1992). Plaintiffs have not pointed the Court toward any evidence tending to show that either 1) market timing trading was not detrimental to the overall performance of Principal's separate accounts; or 2) Principal was not acting in the interests of the Plan's participants and beneficiaries in imposing the market timing trading restriction. Rather, Plaintiffs have simply challenged the authority of Principal executives to offer testimony addressing the detrimental im-

pact of market timing trading on the Plan. In their response to Defendants' statement of material facts, Plaintiffs object to use of deposition testimony by Mark Stark, an investment liaison officer for Principal, and Paul Brown, a Principal vice president, to support statements that the high fluctuations in cash flow experienced as a result of market timing trading had a negative impact on the performance of the international separate accounts. In deciding on summary judgment, the Court's role is not to weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The Court finds that the Defendants met their burden of showing an absence of genuine dispute as to any material fact regarding the negative impact of market timing trading on the Plan. Defendants presented evidence indicating a detrimental impact of market timing trading on the performance of Principal's separate accounts.

It is fundamental that once a summary judgment motion has been made and properly supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e). Here, however, Plaintiffs have failed to set forth any facts that show a genuine issue for trial on this issue. Plaintiffs have objected to the knowledge of the individuals through whom Defendants have provided facts about the negative impact of market timing trading. However, Plaintiffs have not attempted to present testimony from anyone they consider appropriate to address this issue. The role of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine wheth-

er trial is actually required." *Wynne v. Tufts University School of Medicine,* 976 F.2d 791, 794 (1st Cir.1992) (citations omitted). In order to survive a motion for summary judgment, the nonmoving party must present enough evidence for a reasonable jury to return a verdict in his or her favor. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. Plaintiffs have not done so here.

### 2. Principal as Plan Administrator

■ The Court must also decide if Principal's actions as Plan Administrator in acquiescing to the market timing restriction imposed by Principal as investment manager were authorized by the Plan. Initially, there is a dispute between the parties as to whether the Plan Administrator's construction of the "defer or stop" language in the GAC is entitled to review under an abuse of discretion standard. Defendants argue that since the Plan Administrator was given discretion by the Plan itself to construe the Plan's terms that Ms. DeHaai's decision for Principal as employer and Plan Administrator to allow the market timing restriction must be reviewed only to determine whether the decision was reasonable; that is, whether it was supported by substantial evidence. *Cash,* 107 F.3d at 641. Under abuse of discretion review, the administrator's decision is reasonable if "a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Id.* (citation omitted).

What the Plan Administrator did in acquiescing to Principal as investment manager's exercise of a reserved right under the GAC does not strike the Court as an exercise of discretion in interpreting the Plan's provisions, as the Plan authorizes. The law surrounding ERISA does permit plan administrators to reserve for them-

selves discretion to construe plan terms, and it is clear that the plan document in question here did so. However, the Group Annuity Contract is a separate document from the plan document. The plan document defines the relationship between Principal as employer and its employee participants and beneficiaries. The GAC, however, is a contract whose parties are Principal, in its role as investment advisor, and Principal, in its role as employer.[4] Defendants argue that the plan document incorporates the GAC by reference. Section 4.04 of the Plan, entitled "Investment and Timing of Contributions," provides that

> The handling of Contributions is governed by the provisions of the Trust Agreement, the Annuity Contract [GAC], and any other funding arrangement in which the Plan Fund is or may be held or invested. To the extent permitted by the Trust Agreement, Annuity Contract [GAC], or other funding arrangement, the parties named below shall direct the Contributions to . . . any of the investment options available under the Annuity Contract . . . and may request the transfer of amounts resulting from those Contributions between such investment options and investment vehicles or the transfer of amounts between the guaranteed benefit policy portion of the Annuity Contract and such investment options and investment vehicles.

In order to decide whether the Plan Administrator is interpreting the Plan's terms in making a disputed decision under the Plan, it is necessary to examine what question the Administrator was required

to answer in making the decision. *Hogan v. Raytheon, Co.*, 302 F.3d 854, 856–57 (8th Cir.2002). If the question the administrator is answering does not require an interpretation of the Plan's terms, *de novo* review is appropriate. *Id.* (citations omitted). In making the decision about whether to acquiesce to Principal's imposition of a market timing trading restriction, the question that Principal as Plan Administrator was required to answer was whether Principal as investment manager was permitted to restrict market timing trading to $30,000 per day in the international separate accounts. This question required interpretation of the GAC, not the plan document itself, which the Plan Administrator has no discretion to construe. Defendants admit as much in their brief, indicating that at the point at which Principal imposed the mandatory restriction, the Plan Administrator "no longer had the discretion to prevent the restrictions." Thus, Principal's decision as Plan Administrator regarding the market timing trading restriction is reviewed *de novo*.

The Court has already found that the language of the GAC permitting Principal as investment manager to "defer or stop" contributions did authorize the imposition of the market timing trading restriction of $30,000 per day. Thus, the Plan Administrator's decision to acquiesce in the imposition of the market timing trading restriction was not a violation of the Plan's terms, as the Plan expressly mandated deferring to the GAC with respect to direction of contributions and transfers into the international separate accounts.

---

4. The actual parties to the GAC, as listed, are Bankers Life Company and Trustees of the Bankers Life Company Trust for the Pension Plan for Home Office and Field Employees (Except Agency Managers and Agency Supervisory Assistants) and Select Savings Plan for Home Office and Field Employees (Except

Agency Managers and Agency Supervisory Assistants). From the pleadings and argument, however, the Court understands these entities to correspond to, respectively, Principal as investment manager and Principal as employer.

Since the market timing trading restriction imposed by Principal was expressly permitted by the GAC, the Court need not address whether Principal would have had a fiduciary duty to violate the express terms of the Plan if the language had not permitted the restriction and if Principal had determined that it had a fiduciary responsibility under 29 U.S.C. § 1104 to restrict market timing trading. The Court notes, however, that if a fiduciary were truly presented with such a situation, the more appropriate avenue would seem to be the amendment of the Plan or GAC to impose such a restriction, unless emergency circumstances dictated faster action than would be possible through amendment.

### 3. Equitable Estoppel

■ Plaintiffs also oppose summary judgment on their claim for recovery of benefits under § 1132(a)(1)(B) on equitable estoppel grounds. They argue that Defendants are estopped from arguing that the plan documents, specifically the GAC, allowed imposition of the market timing trading restriction because of previous statements by Principal employees indicating that the restriction was not allowed under the terms of the plan. The facts as presented by Plaintiffs are essentially as follows. When Brian Borneman first learned of Defendants' attempts to limit market timing trading, he inquired of various individuals at Principal whether the plan document, the GAC, or other documents permitted the limitation. The individuals with whom he spoke were: 1) Andrea McCoy, who drafted the language of section G of the GAC, and who told Mr. Borneman that it was not her intention when writing the language to allow such a restriction, since market timing trading did not exist then and she therefore had no knowledge of it; 2) Bret Taber, who is identified as someone who "works with McCoy," who offered the

opinion that the Defendants did not have authority under the GAC to impose the restriction; 3) Jim Aldridge and Ross Oltmann, identified only as "Principal employees," who allegedly told Mr. Borneman that they did not believe the GAC allowed the market timing trading limitation. The Court notes that it can find no evidence in the summary judgment record that either identifies Jim Aldridge or Ross Oltmann or discloses any conversations that Mr. Borneman may have had with these individuals. Therefore, the Court will ignore Plaintiffs' allegations regarding the statements of these individuals in addressing the equitable estoppel issue.

The Court finds numerous additional problems with Plaintiffs' argument. Even if equitable estoppel can give rise to an ERISA claim, a question which the Eighth Circuit has left open, *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 953 (8th Cir.1994), a participant must prove a material misrepresentation on which he or she reasonably relied to his or her detriment. *Id.* ("[C]ourts recognizing estoppel in ERISA cases require proof of a material misrepresentation on which the participant or beneficiary has reasonably relied to his detriment.") (citing *Black v. TIC Inv. Corp.*, 900 F.2d 112, 115 (7th Cir.1990)).

Plaintiffs do not point the Court to any facts that indicate that Mr. Borneman's reliance on the statements of any of these individuals would have been reasonable. Andrea McCoy was a contract writer for Principal. Mr. Borneman has testified that he asked her, subsequent to being informed in February of 2001 that Principal was requesting that plan sponsors ask participants to voluntarily discontinue market timing trading, whether anything in the GAC would allow Principal to impose a restriction on market timing trading of $30,000 per day. In her deposition,

Ms. McCoy denied any recollection of this conversation. However, examining the evidence in the light most favorable to Plaintiffs, the best inference that can be drawn is that she told Mr. Borneman that she did not intend, when writing the contract, to allow latitude for Principal to restrict market timing trading.[5] She offered no opinion as to whether Principal actually could impose the restriction. She only stated that she did not intend when writing the contract to allow such latitude. The Court does not find that this statement is contradictory to statements by Defendants that the plan documents did allow them to impose a market timing trading restriction. The contract drafter's interpretation of contract language does not necessarily control, especially in the ERISA context. Both before and after that conversation, the undisputed evidence shows that Mr. Borneman had a significant amount of correspondence with individuals acting in an official capacity who communicated that indeed Principal did have authority under the plan documents to impose a market timing trading restriction of $30,000 per day. Although the Court does not find Ms. McCoy's statement to be contradictory to those made by Principal employees later, even if it were Ms. McCoy was not authorized to speak for Principal on this matter to Mr. Borneman, and any assumption by Mr. Borneman otherwise would simply have been unreasonable based upon the undisputed facts in the record.

Mr. Taber is identified only as someone who worked "with/for" Ms. McCoy, and with whom Mr. Borneman has a "real good friendship both personally and professionally." At his deposition, Mr. Borneman testified that "it was [Mr. Taber's] *opinion*

... that the contract did not have the ability to limit people making those types of transfers." (emphasis added). As with Ms. McCoy's statement about the terms of the GAC, Mr. Taber's statement does not convey an official interpretation of Plan terms. Any reliance by Mr. Borneman on this statement would have been unreasonable. There is absolutely no evidence offered by Mr. Borneman that either the statement of Ms. McCoy or that of Mr. Taber was one that either individual was authorized to make as a representative of Principal. Mr. Borneman did have a significant number of conversation in which authorized representatives of Principal discussed the market timing trading restriction with him, and the interpretation of the plan documents expressed in these conversations was universally contrary to the opinions expressed by Ms. McCoy and Mr. Taber.

Plaintiffs cite *Kane v. Aetna Life Insurance*, 893 F.2d 1283 (11th Cir.1990), as authority for their argument that statements of various Principal employees interpreting the GAC as not allowing the market timing trading restriction estop Defendants from now asserting a contrary interpretation. In that case, the Eleventh Circuit found that the federal common law of equitable estoppel could be applied in a case where one of the Plaintiffs, a Plan participant, relied on statements made on two occasions by "duly authorized representative[s]" of Defendant Aetna that his medical benefits plan would cover medical expenses for a young child he was about to begin the process of formally adopting. *Id.* at 1286. The Plaintiff thereafter incurred substantial medical expenses in re-

---

5. "Q. What did you ask [Andrea McCoy]? A. If when she was writing the FIA contract it was her intention to allow Principal the latitude to restrict, limit transfers into any of the separate accounts. Q. What did she tell you? A. It was not her intention when she was writing the contract to allow that latitude. Q. Did you ask her whether or not she thought Principal had the latitude to do that? A. Not that I recall." Depo. of Brian Borneman, 79–80.

liance on this interpretation of the Plan. *Id.* The situation of Plaintiff Brian Borneman is substantially different than that of the Plaintiff in *Kane* and Mr. Borneman, even with all inferences drawn in his favor, has not shown a material misrepresentation on which he reasonably relied to his detriment.

### 4. Nature of the Market Timing Trading Restriction Imposed

■ Separate from the issue of whether Principal had the right to impose *any* market timing limitation on participants and beneficiaries in its 401(k) plan is the issue of whether the Plan limited market timing trading to $30,000 per fund per day or $30,000 aggregate per day, and whether the restriction applied to rebalancing.[6] Plaintiffs have treated this issue in their briefs as related to the issue of whether Defendant Principal breached its fiduciary duty to Plaintiffs by misrepresenting the true nature of the market timing trading limitation under the Plan. The argument, then, is that if Defendant breached its fiduciary duty, Plaintiffs are entitled to recovery of benefits under the Plan. Such an argument is expressly contemplated by the United States Supreme Court's decision in *Varity Corp. v. Howe,* 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). There, the Supreme Court noted that "ERISA specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims ... one that runs directly to the injured beneficiary." *Id.* (citing *Massachusetts Mutual Life Insurance Company v. Russell,* 473 U.S. 134, 144, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) and 29 U.S.C. § 1132(a)(1)(B)).

It is undisputed that at all times between the imposition of the formal restriction and the termination of his employment that Plaintiff Brian Borneman was told by Principal that the market timing trading limit was an aggregate limit across all the international separate accounts. In order to determine whether Defendant Principal's statements to Plaintiff Brian Borneman about the nature of the limit constituted a material misrepresentation, it is necessary to ascertain what policy limitation Principal actually implemented in early June of 2001. On this point, the evidence is disputed. Some members of Principal management involved with making the decision to impose the limitation thought it was to be an aggregate limitation. At least one member of the management team, Mark Stark, thought the limitation was to be a per fund limitation. The letter that Mark Stark sent out on behalf of Principal to inform plan sponsors about the possibility of a limitation does not specify whether the limitation is to be applied per fund or on an aggregate basis.

In early June of 2001, Principal placed a computer restriction on the Plan that limited participants to $30,000 per fund per day. There is testimony from Principal employees that the computer restriction was programmed this way because to program an aggregate limitation would have required a good deal more time and energy.

At a June 14, 2001 meeting, Plaintiff received a memo from Natalie Bachman, Joni Tibbetts, and Chris Bowman that stated that his one-day transfers would be limited to $30,000. On June 18, 2001, Plaintiff sent an e-mail to Natalie Bach-

---

**6.** The Court's understanding of rebalancing is that a participant in the plan could have an account set up to ensure that his or her investments conformed with a specific ratio, i.e. 25% international small company, 25% international emerging markets, 25% large cap,

25% bond. Over time, as the value of the investments in each type of account fluctuated, the ratio would be out of balance. An employee could then rebalance the account to reflect the preferred distribution. This could be done as often as on a daily basis.

man asking for clarification as to whether the limitation was an aggregate or per fund limitation. Bachman sought guidance on this question from Paul Brown, who indicated that the limitation was to be applied in the aggregate.[7]

On July 30, 2001, one of Principal's retirement services relationship managers sent a letter to Tammy DeHaai to "follow up" on the market timing situation. In this letter, the relationship manager indicated that because certain Plan members had continued to engage in "excessive" market timing trading, Principal had implemented certain limitations in the Plan. Among the limitations listed was "[o]ne-day transfers from the domestic accounts into the international accounts will be limited to $30,000 per fund, per day." It is undisputed that at least one Principal employee was being permitted to trade up to $30,000 per fund, per day.

Once Plaintiff's manager became aware of this letter and that the limitation imposed on Plaintiff was more stringent, she alerted management. On September 10, 2001, Principal's vice president for human resources sent a letter to the individuals who had been identified as market timing traders stating that "[a]s clarification, the $30,000 amount is an *aggregate* limitation, not a per fund limitation." (emphasis in original).

Principal argues that the facts demonstrate that its intention all along was to impose an aggregate limitation, and that there was simply confusion in implementing it. The Court, however, finds that a reasonable factfinder could also come to the conclusion that the intended limitation was a per fund limitation that was imperfectly implemented. Specifically, the fact that the computer limitation was pro-

grammed as a per fund limitation, the fact that Mr. Stark's understanding was that the limitation was per fund, and the July 30, 2001 letter to Tammy DeHaai support this inference. However, because the evidence is not so one-sided as to foreclose the possibility that Principal's interpretation of the facts is the correct one, the Court denies summary judgment to both parties on this segment of Plaintiffs' claim. The Court notes that there is no dispute that Principal was acting as a fiduciary when it made statements to Plaintiff regarding the aggregate nature of the Plan limitation, nor is there dispute that the Plaintiff relied on these representations. If it is determined at trial as a matter of fact that the original limitation implemented in June 2001 was indeed a per fund limitation, rather than an aggregate limitation, then Principal's statements to Plaintiff regarding the nature of the limit would have been material misrepresentations and Plaintiffs may be entitled to judgment on their claim for recovery of benefits under the Plan based on Principal's breach of fiduciary duty.

Similar dispute exists as to whether rebalancing of an account constituted a transfer for purposes of the market timing trading restriction. In a June 21, 2001 e-mail, Natalie Bachman informed Mr. Borneman that rebalancing of his account would be considered a same day transfer for purposes of the limitation and that if the $30,000 limit was exceeded because of account rebalancing, Mr. Borneman would be terminated. However, in Principal's July 30 letter to Tammy DeHaai following up on the restriction, Principal indicated that the trading limit did not apply to rebalancing. The above analysis of the per fund versus aggregate confusion ap-

---

**7.** The Court notes that Ms. Bachman's affidavit attached to Defendant's Supplemental Appendix indicates that she sought guidance from Paul Brown on this issue. At her deposition, Ms. Bachman could not recall who she spoke with about this issue at the time that Mr. Borneman posed his question.

plies to the rebalancing situation as well. If it is determined at trial as a matter of fact that the limitation implemented by Principal did not in fact include rebalancing in the daily amount total, Plaintiffs may be entitled to judgment for recovery of benefits that they could have obtained by rebalancing.

In summary, the Court grants Defendants' motion for summary judgment to the extent that Plaintiffs' claim for recovery of benefits under the Plan is premised on the invalidity of the market timing trading restriction generally. The Court leaves for trial the issue of whether Plaintiffs can recover benefits under the Plan based upon the imposition of a $30,000 aggregate limitation, rather than per fund, and based upon a prohibition on rebalancing above $30,000 per day.

## C. Breach of Fiduciary Duty

As an initial matter, the Court must attempt to situate Plaintiffs' breach of fiduciary claim in the context of ERISA's remedial scheme. There are two provisions of 29 U.S.C. § 1132 that authorize individual relief to participants and beneficiaries where they have suffered losses because an ERISA fiduciary has breached a fiduciary duty under the statute. First, 29 U.S.C. § 1132(a)(1)(B) "provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims." *Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). The Court addressed this iteration of Plaintiffs' breach of fiduciary duty claim in section II.B.4 with respect to Plaintiffs' claim for recovery of benefits under the Plan based on the allegedly more restrictive $30,000 aggregate and rebalancing limitations to which Plaintiff Mr. Borneman was subjected. Second, § 1132(a)(3) acts as a "catch-all" provision, or a "safety net, offering appropriate equitable relief for injuries caused by violations that § 502 [§ 1132]

does not elsewhere adequately remedy." *Id.* at 1077–78.

■ The Court notes that Plaintiffs have also sought relief for breach of fiduciary duty under § 1132(a)(2), which permits a party to bring a civil action for relief under 29 U.S.C. § 1109. That section provides that a fiduciary who breaches his or her responsibilities under ERISA shall be personally liable to make the plan whole for the losses that have been caused by the breach. Plaintiffs in this action are not seeking to compel Defendants to provide any relief to the Plan; rather, Plaintiffs are seeking individual relief. Section 1109 does not provide such relief, therefore Plaintiffs have no claim under this section. *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 144, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) ("[T]he entire statutory text of [§ 1109] persuades us that Congress did not intend that section to authorize any relief except for the plan itself.").

Plaintiffs have set out three theories of recovery for breach of fiduciary duty: 1) Defendant Principal failed to comply with the language of the Plan and the GAC, as well as their own $30,000 per fund limitation, in imposing the market timing trading restriction; 2) Defendant Principal made a number of material misrepresentations to Plaintiff Brian Borneman relating to market timing trading; and 3) Defendant Principal failed to provide honest and complete answers to Plaintiff Brian Borneman's questions, and failed to convey to him material information about the Plan.

### 1. Failure to comply with the language of the Plan, the GAC, and the $30,000 per fund limitation

The Court has already decided that the Defendants did comply with the language of the Plan and the GAC in imposing the market timing trading restriction on plan participants and beneficiaries, including

Plaintiffs. Plaintiffs therefore have no claim for breach of fiduciary duty to the extent they rely on noncompliance with the language of the Plan or the GAC. Parenthetically, the Plaintiffs indicate in their brief that their claim under § 1104(a)(1)(D) includes Defendant's failure to comply with "their own $30,000 per fund limitation." 29 U.S.C. § 1104(a)(1)(D) indicates that a fiduciary must discharge his duties with respect to a plan "in accordance with the documents and instruments governing the plan."

> The ordinary meaning of the word 'instrument' is '[a] formal or legal document in writing, such as a contract, deed, will, bond or lease ... or [a] writing which gives formal expression to a legal act or agreement, for the purpose of creating, securing, modifying, or terminating a right.' BLACK'S LAW DICTIONARY 801 (6th Ed.1990); *see* 29 U.S.C. § 1104(a)(1)(D) (fiduciary must discharge duties 'in accordance with the *documents and instruments* governing the plan').

*Brown v. American Life Holdings, Inc.*, 190 F.3d 856, 861 (8th Cir.1999) (emphasis in original). In *Brown*, the Eighth Circuit went on to hold that the phrase "other instruments" in 29 U.S.C. § 1024(b)(4) included only "formal documents that establish or govern the plan." *Id.* In this case, the formal legal document that authorized Defendant Principal to impose the market timing trading restriction on participants and beneficiaries of Principal's 401(k) plan, including Plaintiffs, was the GAC. The actual $30,000 restriction was not embodied in that document; rather, that document gave Principal the right to defer or stop contributions or transfers among investment vehicles if certain criteria were met. The possibility of a limitation was first communicated by Principal in its role as investment manager to Principal in its role as plan sponsor and employer in a February 6, 2001 letter from Mark Stark to Tammy DeHaai. Around the beginning of June, 2001, a computer limitation was imposed that restricted market timing trading for participants to $30,000 per day per fund. The limitation of $30,000 per day per fund was confirmed in writing on July 30, 2001 in a letter from Lori Froehlich, an RIS relationship manager to Tammy De-Haai. On September 10, 2001, Principal's vice president of human resources sent a letter to individuals who had been identified as market timing traders indicating that the $30,000 limitation was an aggregate limitation. None of the aforementioned documents can be construed to embody the formality that ERISA requires of "documents and instruments governing the plan." Consequently, Defendant is entitled to summary judgment on this theory.

*2. Material misrepresentations related to market timing trading*

Plaintiffs have alleged that Defendant made the following material misrepresentations: 1) the GAC prohibited *all* market timing trading; 2) Plaintiff was the only individual who continued to engage in market timing trading at Principal; 3) Defendants were forced to implement the computer restriction and use large company resources solely because of Plaintiff Brian Borneman's trading; and 4) the $30,000 aggregate per day limitation was imposed on all participants, not just Plaintiff Brian Borneman.

■ To establish a claim for breach of fiduciary duty based on alleged misrepresentations regarding the terms of an employee benefit plan, a plaintiff must show 1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; 2) that these constituted material misrepresentations; and 3) that the plaintiff relied on those misrepresentations to their detriment." *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir.2002). Whether a misrepresenta-

tion is material is a mixed question of law and fact. *Id.* "'A misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision.'" *Id.* (quoting *Fischer v. Phila. Elec. Co.*, 994 F.2d 130, 135 (3d Cir.1993)).

With respect to the Plaintiffs' first, second, and third alleged misrepresentations, the Court need not delve into deciding whether, if made, the misrepresentations were material. Plaintiffs, who have the burden of proof, have simply presented no evidence to indicate that they relied on any of these alleged misrepresentations to their detriment. Consequently, Defendant is entitled to summary judgment on Plaintiffs' breach of fiduciary duty claim to the extent it relies on those alleged misrepresentations.

The Court denies summary judgment to both parties on Plaintiffs' claim that Defendant Principal breached its fiduciary duty to Plaintiffs by materially misrepresenting the true nature of the market timing restriction it applied to the Plan. As discussed in section II.B.4, Plaintiffs claim that Plaintiff Mr. Borneman was subjected to harsher limitations than other Plan participants; namely, that his market timing trading was restricted to $30,000 per day aggregate, where other participants were permitted to engage in market timing trading up to $30,000 per day per fund, and that any amount he rebalanced was included in the $30,000 limit.

The Court believes that, to the extent that Plaintiffs are seeking as damages the benefits that they would have received under the Plan had the more lenient $30,000 per fund restriction and permission to rebalance over and above the restriction been communicated to Mr. Borneman, that this claim is properly analyzed under § 1132(a)(1)(B), an analysis the Court conducted in section II.B.4. *See Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (finding that ERISA specifically provides a remedy for breaches of fiduciary duty that runs directly to the injured beneficiary with respect to the interpretation of plan documents under § 1132(a)(1)(B)). The Court notes that conducting the analysis under that section, rather than under § 1132(a)(3) does not appear to prejudice Plaintiffs in any way, in that the damages that they can seek under § 1132(a)(3) seem to be, practically speaking, identical to those they can recover under § 1132(a)(1)(B). If Defendants are found to be liable for breach of fiduciary duty relating to misrepresentations about the market timing limitation and availability of rebalancing, Plaintiffs can recover the benefits they would have received under the Plan under § 1132(a)(1)(B). The Court, however, will leave open the possibility that Plaintiffs may argue for other "equitable" forms of relief if Defendant is found to have breached its fiduciary duty by making material misrepresentations to Plaintiff. Defendant in its reply brief argued that Plaintiffs were not seeking "equitable relief" for breach of fiduciary duty, therefore Defendant was entitled to summary judgment. However, since Defendant raised this issue in its reply brief Plaintiffs had no opportunity to rebut this argument. The Court declines to enter the quagmire that "equitable relief" under ERISA has lately become without the benefit of full argument on this issue.

*3. Failure to Convey Material Information about the Plan*

The Court's job in reviewing Plaintiffs' claim for breach of fiduciary duty based upon Defendants' failure to convey material information about the Plan is made immeasurably harder by the fact that Plaintiffs fail to indicate the precise material information that Defendants failed to convey. Plaintiffs simply state that "[i]n response to Brian's questions asked over a period of several months, Defendants ...

intentionally refused to provide Brian with complete answers to his questions." The summary judgment record in this case consists of over 1400 pages of evidence. The Court surmises that Plaintiff is reiterating here allegations made elsewhere: that Principal failed to provide Plaintiff Brian Borneman with Plan documents upon his request and that Principal provided misinformation about whether the restriction limited trading to $30,000 aggregate or per fund and whether rebalancing was permitted. The Court has already addressed the issue of the confusion surrounding the per fund versus aggregate limitation, as well as the rebalancing issue, in section II.B.4 of this opinion.

It is settled law in the Eighth Circuit that "the duty of loyalty requires an ERISA fiduciary to communicate any material facts which could adversely affect a plan member's interests." *See Shea v. Esensten,* 107 F.3d 625, 628 (8th Cir.1997) (citing *Howe v. Varity Corp.,* 36 F.3d 746, 754 (8th Cir.1994)). In order to prevail on a breach of fiduciary duty claim based on failure to disclose, then, a plaintiff must show that material facts were not communicated to him and that those material facts could have adversely affected his interests as a plan member. The record reflects that Principal appears to have responded to Plaintiff Brian Borneman's inquiries about the market timing trading limitation each time he made such inquiries. It appears, then, that what Plaintiff complains of is the sufficiency of Principal's responses; namely, Principal's failure to provide to Plaintiff the language of the GAC itself, which contained the basis for the market timing limitation. However, failure to communicate the precise terms of the GAC did not adversely affect Plaintiff Brian Borneman's interests as a Plan member.

In an August 27, 2001 e-mail, Plaintiff propounded the following question to Colleen Schumacher: "Please show me where this restriction is located? Either in the plan document, booklet, or contract. I need to see some legal document that indicates what you are saying. Please provide me with copies of the plan document, booklet, and contract. Also please indicate where in the document you are basing this restriction off of." In response to this e-mail, Principal clearly indicated that the GAC was the source of the market timing trading restriction, stating that "[o]ur service provider (Principal Life Insurance Company) has informed us that, pursuant to our group annuity contract, they are imposing trading limitations on international accounts." Failing to provide the GAC itself upon written request is a violation of ERISA, which the Court discusses elsewhere in this opinion, for which Plaintiff may be entitled to receive a statutory penalty from Defendants. However, the question of whether Defendant breached a duty of loyalty by failing to provide the GAC is a separate question. Here, provision of the GAC itself in response to Plaintiff's question would not have communicated any additional material facts. As the Court has found, Principal had a right to impose trading limitations and exercised this right. The response Plaintiff received to his question about the origin of the right to impose the restriction contained the same information that provision of the GAC itself would have yielded. While in a different situation failure to provide precise plan language to a participant upon request might be considered a breach of a fiduciary's duty of loyalty, here Principal's conduct in failing to provide Plaintiff with the Plan document does not rise to that level.

D. Invalidation of Market Timing Trading Restriction because of Failure to Amend

The Court finds that, based on its conclusion that Defendant Principal had the

power under the GAC as it was written to implement the market timing restriction, Principal was not required to amend either the Plan or the GAC in order to impose the limitation. *See Dooley v. American Airlines, Inc.,* 797 F.2d 1447, 1452 (7th Cir.1986) ("We are unwilling to contort the plain meaning of 'amendment' so that it includes the valid exercise of a provision which [is] already firmly ensconced in the pension document."); *Straus v. Prudential Employee Savings Plan,* 253 F.Supp.2d 438, 449–50 (E.D.N.Y.2003) (where plan document granted the fiduciary the power to adopt rules and procedures to govern participant elections and directions, imposition of limitations on transfers from one investment option to another did not constitute a plan amendment); *Stewart v. Nat'l Shopmen Pension Fund,* 730 F.2d 1552, 1561 (D.C.Cir.1984) (there is no "amendment" when a "provision already incorporated into the plan [is] applied [and] [a]ctions authorized by the plan [a]re carried out by the persons authorized to do so"). Consequently, the Court grants summary judgment for Defendants on this claim.

### E. Retaliation and Interference

This Court is mindful in deciding whether to grant summary judgment on the issues of retaliation and interference under ERISA that the Eighth Circuit "has repeatedly cautioned that summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based ... Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.,* 145 F.3d 986, 990 (8th Cir.1998) (citations omitted). *See also Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991) ("sum-

mary judgment should seldom be used in employment-discrimination cases")); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). This is because "inferences are often the basis of the claim ... and 'summary judgment should not be granted unless the evidence could not support any reasonable inference' of discrimination." *Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1156 (8th Cir.1999) (quoting *Lynn v. Deaconess Med. Ctr.-West Campus,* 160 F.3d 484, 486–87 (8th Cir.1998)).

29 U.S.C. § 1140 (2003) provides that: It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or] this subchapter.

 Breaking section § 1140 down, it prohibits two categories of adverse employment action: 1) retaliation, where the adverse action is taken because a participant or beneficiary has exercised any right to which he is entitled under the provisions of an employee benefit plan or ERISA; and 2) interference, where the adverse action is taken for the purpose of interfering with any right to which a participant or beneficiary may become entitled under an employee benefit plan or ERISA. Before reaching the ultimate question of the decisionmaker's motive, a claimant must show that he was subjected to an adverse employment action. As well, an individual claiming retaliation must show that he engaged in activity that was protected by either his employee benefit plan or ERISA itself. Claims under § 1140 are analyzed in the same manner as discrimination

cases under Title VII and the ADEA. *Kinkead v. Southwestern Bell Telephone Company*, 49 F.3d 454, 456 (8th Cir.1995).

The parties here disagree as to whether the Court should analyze these claims under the three-step burden-shifting paradigm established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or under the mixed-motives analysis articulated in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). The critical difference between these two standards is the allocation of the burdens of proof and production. The *Price Waterhouse* standard has been dubbed the "direct evidence" analysis by the Eighth Circuit. *Rivers–Frison v. Southeast Missouri Community Treatment Center*, 133 F.3d 616, 619 (8th Cir. 1998). In order to obtain review under the *Price Waterhouse* standard, "the plaintiff must present 'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision.'" *Rivers–Frison v. Southeast Missouri Community Treatment Center*, 133 F.3d 616, 619 (8th Cir.1998) (quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir.1993)); *see also Gagnon v. Sprint Corp.*, 284 F.3d 839, 847 (8th Cir.2002) (to obtain *Price Waterhouse* review, plaintiff must produce direct evidence that an illegitimate criterion played a motivating role in the decisionmaking process). The United States Supreme Court has recently clarified that direct evidence per se is not required to obtain a mixed motives jury instruction; rather, "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" *Desert Palace, Inc. v. Costa*, —— U.S. ——, ——, 123 S.Ct. 2148, 2155, 156 L.Ed.2d 84 (2003) (quoting 42 U.S.C. § 2000e–2(m)). Once such evidence is established, the burden shifts to the defendant to prove by a preponderance of the evidence that it would have reached the same employment decision absent any discrimination. *Gagnon*, 284 F.3d at 847.

Recognizing that "explicit, inculpatory evidence of discriminatory intent is rare," the Supreme Court in *McDonnell Douglas* set out an alternative method of proof for employment discrimination claims. *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776 (8th Cir.1995) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Under this method, a plaintiff creates an inference of intentional discrimination by establishing a prima facie case. The prima facie case earns the plaintiff a rebuttable presumption that intentional discrimination played a role in the adverse employment action. *Id.* Once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 776–77. If the defendant is able to do so, the burden shifts back to the plaintiff to demonstrate that the reason provided was a pretext for discrimination. The burden of persuasion regarding discrimination remains at all times with the plaintiff. *Id.* at 777.

Plaintiff argues for application of the *Price Waterhouse* standard, while Defendant argues that the *McDonnell Douglas* paradigm is appropriate. However, in his briefing Plaintiff also responds to Defendant Principal's *McDonnell Douglas* analysis, so the Court will assume that Plaintiff is proceeding under both theories and will analyze Plaintiff's claim under each framework. Under either frame-

work, the Court concludes that a genuine dispute exists as to Defendant's motive in taking a number of adverse employment actions against Plaintiff, precluding summary judgment for either party.

### 1. Adverse employment action

Under both the *McDonnell Douglas* and the *Price Waterhouse* frameworks, and for both the retaliation and interference theories, a claimant must show an adverse employment action. Plaintiff Brian Borneman alleges a number of different actions that he claims constitute adverse employment actions. His list includes 1) termination; 2) performance warnings; 3) raising of "performance issues"; 4) raising issues relating to personal time off; 5) subjecting him to different and more restrictive limits on trading; 6) removing him from the demutualization project on which he had been working; 7) threatening his promotions, salary increases, and career at Principal if he didn't stop market timing trading altogether, even though he was permitted to engage in market timing trading up to $30,000 per day; 8) blocking his ability to obtain employment in another Principal department; 9) preventing him from working with or seeking input from others on projects; 10) ordering him to perform menial tasks; 11) making material misrepresentations to him regarding the plan, GAC, and trading restrictions. In this section, the Court addresses each of these categories of employment actions without inquiring into the actual motives of Principal in taking the actions. The Court's only concern here in this section is to determine whether, if such actions were taken for discriminatory purposes, they could be considered adverse employment decisions.

In analyzing what constitutes an adverse employment decision, the Eighth Circuit has concluded that

"Although 'actions short of termination may constitute adverse actions . . .', 'not

everything that makes an employee unhappy is an actionable adverse action.'" *Montandon v. Farmland Industries, Inc.,* 116 F.3d 355, 359 (8th Cir.1997) (discussing an unlawful retaliation claim in the context of Title VII) (quoting *Smith v. St. Louis University,* 109 F.3d 1261, 1266 (8th Cir.1997); *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir.1996)). To constitute an adverse employment action, "the action must have some adverse impact" on the employee. *Id.* . . . Defined another way, an adverse employment action must effectuate "a material change in the terms or conditions of . . . employment." *Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997) (discussing adverse employment actions in the context of a retaliation claim brought along with a Title VII claim); *see also Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994) (no prima facie case is made where changes in duties or working conditions cause no materially significant disadvantage to establish an adverse employment action).

*Bechtel v. City of Belton,* 250 F.3d 1157, 1162 (8th Cir.2001).

As an initial matter, the Court finds that, as a matter of law, subjecting Mr. Borneman to different and more restrictive limits on trading or making material misrepresentations to Mr. Borneman regarding the Plan, GAC, and trading restrictions, even if these actions actually occurred as alleged, cannot constitute adverse employment actions. Consequently, Defendants are entitled to summary judgment on Plaintiff's retaliation and interference claim to the extent it is based on these two actions.

It is equally clear to the Court that Principal's termination of Plaintiff, as well as formal written warnings issued to him, do constitute adverse employment ac-

tions based on the undisputed evidence. The adverse effect of termination is obvious, and there is considerable evidence here that Plaintiff's performance warnings were a direct cause of his being chosen as the person to be downsized from his department. The Eighth Circuit has recognized that "papering" an employee's file with negative reports or reprimands is sufficiently adverse to meet the Title VII standard for retaliation claims. *Tademe v. Saint Cloud State University*, 328 F.3d 982, 992 (8th Cir.2003) (citations omitted). The Court notes, however, its agreement with Defendant Principal that in the interference context, there is no evidence to support the inference that Defendant terminated Plaintiff intending to interfere with his right to engage in market timing trading. Since Plaintiff retained his employee benefit plan after termination, he was able to continue market timing trading even after his employment was terminated. There is no basis upon which a reasonable factfinder could come to the conclusion that Defendant Principal terminated Plaintiff in order to get him to stop market timing trading. If anything, the incentive for Plaintiff to engage in market timing trading after termination is much greater, since he would have no longer had to deal with the consequences of the displeasure of his superiors and fear of retaliation surrounding his market timing trading activity. Thus, on the facts presented here, even drawing all reasonable inferences in favor of the Plaintiff, Plaintiff cannot support an interference claim based on his termination.

The remaining actions fall into a grayer area. Plaintiff has presented evidence that supports an inference that the raising of performance issues in an informal manner by his superiors contributed to poor evaluations in a more formal setting (i.e. written warnings, formal performance evaluations), which contributed to Plaintiff's eventual termination. Therefore, the Court finds that there is a genuine dispute about whether informal performance reviews constituted adverse employment actions sufficient to present an issue for trial.

■ Plaintiff was also removed from a short-term demutualization project on which he had been working. The Court finds that Plaintiff has not presented sufficient evidence to allow a reasonable factfinder to determine that the removal from this project had a material and adverse impact on the terms and conditions of his employment. Plaintiff has indicated that he hoped that his work on this project would put him a position such that he would be considered for a position in a new department once Principal become a public company; however, there is no evidence to indicate that removal from the project had any adverse impact on that possibility. Consequently, to the extent Plaintiff's § 1140 claim is based upon removal from the demutualization project, Defendants are entitled to summary judgment.

■ Regarding Plaintiff's assertion that threats about his future career constitute adverse employment action, the Court finds that threats such as the ones Plaintiff has presented evidence of [8] can constitute

---

**8.** *See infra* at 965–966. Specifically, at the June 14, 2001 meeting Joni Tibbetts indicated to Plaintiff that "[i]t's up to you to decide if you want to continue to do this. Certainly the system is going to allow you to choose up to $30,000 but there are other issues … again, the choice is yours, Brian." At the same meeting, Chris Bowman said to Plaintiff "I think it's hard, it's very hard for me to esti-

mate the damage you have done to your own reputation and t your career potential here at Principal with the way you've handled this. Like Joni said, your name is being spoken in some of the highest offices in our heart of this company and it's not in favorable light;" "We're talking about your career Brian, not your short-term dealing inside this … If you

an adverse employment action in the context of an interference claim. Although these threats do not immediately affect the terms and conditions of a claimant's employment, they do materially affect whether or not such employee can freely exercise his ERISA rights. By prohibiting retaliation *and* interference, § 1140 creates a seamless web of protection for participants and beneficiaries. Participants and beneficiaries are protected from attempts to discourage them from exercising rights under ERISA or their employee benefit plans, and they are protected if exercise of these rights actually results in an adverse employment action. If interference did not encompass protection against threats of discrimination, employers would be free to threaten employees with severe adverse employment actions, including termination, for exercising their rights. Certainly some employees would go on to exercise those rights and, if the employer made good on the threat of adverse action, a retaliation claim would adhere. However, a certain percentage of employees would surely engage in a mental balancing that would ultimately favor avoiding adverse employment action over asserting a protected right under ERISA. Without a prohibition on threats, employers would be given a green light to engage in intimidation tactics that would certainly succeed in scaring at least some employees away from exercising rights to which they are entitled. The Court finds, however, that though these threats are adverse actions for the purpose of Plaintiff's interference claim, they do not constitute adverse actions for retaliation purposes. This does not mean, however, that such threats cannot constitute part of the evidence that is used to substantiate Plaintiff's claim that improper motives were at play in adverse decisions that actually were made by Defendant in the retaliation context.

Regarding Plaintiff's assertion that Defendants improperly blocked his ability to obtain employment with Principal's Commercial Real Estate Department, the Court notes that any adverse impact on Plaintiff's prospects for employment with that department stemmed, based on undisputed evidence, from the fact that Plaintiff was on written warning within his own department. Thus, the relevant adverse action is Plaintiff's written warning. Plaintiff does not appear to allege that the failure by the Commercial Real Estate Department to hire him was based on market timing trading. In fact, there is no evidence to support that the department even knew about Plaintiff's market timing trading.

The Court agrees with Defendant that, even if all reasonable inferences are made in favor of Plaintiff, there is insufficient evidence to indicate that there was any material and adverse impact on the overall terms and conditions of employment suffered by Plaintiff as a result of performing "menial tasks" as part of his job. "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Montandon v. Farmland Industries, Inc.*, 116 F.3d 355, 359 (8th Cir.1997). The same holds true for Plaintiff's contention that being prohibited from working with or seeking input from others was an adverse employment action. The evidence presented, making all reasonable inferences in favor of the Plaintiff, does not support such a conclusion as a matter of law. Consequently, to the extent Plaintiff's § 1140 claim is based upon being assigned to perform "menial tasks" or being prevented from working with or seeking input from others summary judgment is granted in favor of Defendant.

The Court notes that the fact that some of the actions alleged by Plaintiff are not

hope to have a future at Principal, this needs to stop."

sufficiently adverse to entitle Plaintiff to recover under § 1140 does not mean that evidence of the motivation behind them cannot be used to assist Plaintiff in meeting his burden of showing improper motive as to the actions that the Court has found can constitute adverse employment actions.

### 2. *Protected activity*

An integral part of Plaintiff's § 1140 claim for retaliation is a showing that he exercised a right to which he was entitled under the terms of his employee benefit plan or under ERISA itself. There is no dispute in this case that throughout the time period relevant to this lawsuit, the market timing trading that Mr. Borneman was engaging in was permitted under the terms of his Plan. Mr. Borneman freely engaged in market timing trading until approximately June 14, 2001. Until that time, there had been no market timing trading restriction in place. Principal had requested that Plaintiff voluntarily limit his trading, but such request does not constitute a limitation under the Plan. Plaintiff's trading to that point was a protected activity. After June 14, 2001, it is undisputed that Mr. Borneman did not trade in excess of the $30,000 limit imposed by Principal, which this Court has found that Principal had the right to impose. Thus, any trading after June 14, 2001 was a protected activity as well. Consequently, any retaliation by Principal on the basis of Plaintiff's market timing trading throughout the duration of his employment would have been prohibited under § 1140. At all times, market timing trading in the amounts engaged in by Plaintiff was a right to which he was entitled under his employee benefit plan.

### 3. *Principal's Motives*

The story painted by Defendant Principal in this case to explain Brian Borneman's negative evaluations and termi-

nation is the "official" story. Defendant has attempted to show that Mr. Borneman's termination occurred as a result of Principal's reduction in force ("RIF") that took place in November of 2001 and was based entirely on performance problems, which were completely unrelated to Mr. Borneman's market timing trading throughout that year. Plaintiff's evidence, on the other hand, attempts to illustrate the subtext of Principal's motives in evaluating his performance and ultimately selecting him for termination during the time that he was engaged in struggle with Principal over the market timing trading issue.

Plaintiff Brian Borneman began working as an Assistant Product Development Consultant for the Product Development Department in January of 2001. The product development division was under the control of Chris Bowman. Directly under Chris Bowman in the chain of command was Joni Tibbetts, the officer responsible for the Product Development Department. From the time Plaintiff began work with the product development division until September of 2001, Natalie Bachman was Mr. Borneman's direct supervisor. Bachman in turn reported to Sheri Hasan, the head of the department. Hasan reported to Tibbetts. In September of 2001 Donna Schecher replaced Natalie Bachman and became Mr. Borneman's direct supervisor.

Defendant Principal's official story, which they have presented evidence to support, goes like this. During his work in the Product Development department, which began in 2001, Plaintiff's supervisors indicated to him a few areas in which he needed to improve his job performance. In his performance review covering the time period from January 2001 through June 2001, Mr. Borneman received a number of negative comments from his co-workers and internal clients. On August 28, 2001, Mr. Borneman was placed on

written warning by Bachman and Hasan. The warning indicated that Mr. Borneman had failed to improve his performance in the areas they had identified as needing work: 1) written communication; 2) proper research and analysis of assignments; 3) following through on assignments, including meeting deadlines; and 4) appropriate tone and content of verbal communication.

On October 29, 2001, Plaintiff was placed on final warning by Hasan and Donna Schecher. The final warning indicated that "failure to meet any of the expectations defined in your Written Warning (copy attached) or further incidents of substandard performance may result in termination of your employment." In the fall of 2001, the RIS business unit, in which Mr. Borneman worked, had a reduction in force to reduce expenses. At least partly on the basis of poor job performance, Mr. Borneman was selected to be downsized. His selection as the downsizee in his department, Defendant argues, had nothing to do with his pattern of market timing trading over the past year.

The subtext, however, goes like this. Mr. Borneman continued market timing trading after his April meeting with Joni Tibbetts in which she requested that he voluntarily discontinue such trading. Because Principal's request was not a mandate, Mr. Borneman's trading activity during this time period was a statutorily protected activity, as it occurred in accordance with the terms of Principal's ERISA benefits plan. Despite the fact that Mr. Borneman's trading activity was in compliance with the Plan, on at least three occasions during the time period of "voluntary compliance," individuals with supervisory responsibility over Mr. Borneman engaged in discussions from which the inference could be made that Mr. Borneman's market timing trading was having a negative effect on perceptions of

his job performance. On May 30, 2001, Colleen Schumacher from human resources e-mailed Joni Tibbetts about Mr. Borneman's continued market timing trading and stated they should give Mr. Borneman a letter indicating that the consequence of exceeding the $30,000 trading limitation, which at this point had not yet even been imposed, would be termination. At some point before sending this e-mail, Schumacher had engaged in a discussion with Chris Bowman where termination had been discussed as an option if Mr. Borneman did not stop trading.

On June 7, 2001, Colleen Schumacher, Joni Tibbetts, and Sheri Hasan held a meeting about Mr. Borneman. Ms. Schumacher's notes from the meeting indicate that some Principal management people, including Chris Bowman, "wanted to be aggressive: ter." In addition, under the heading related to Mr. Borneman's upcoming performance evaluation, the following items were noted: "perceptions/decisions he's making" and "impact of mkt timing."

In a June 7, 2001 e-mail from Sheri Hasan to Colleen Schumacher and Joni Tibbetts, under the heading of "other issues we discussed relative to Brian's performance," Hasan stated that an upcoming meeting they planned to discuss with Mr. Borneman that "[h]e's not making a good case for himself here by being the only one who hasn't stopped trading and given the individuals in upper management who needed to be made aware of this activity." In response to this e-mail, Colleen Schumacher replied to Sheri Hasan and Joni Tibbetts that "[w]e'll want to be cautious that we don't send the message that the performance issues are just now arising as a result of the market timing situation." She also suggested ways to transition from the market timing discussion to the next conversation about job performance. One of these included saying "As we've shared

in the past ... we have concerns about performance." One of the listed performance concerns included "decision not to stop trading after asked by management." On June 13, 2001 Tibbetts forwarded Schumacher's e-mail to Natalie Bachman, Mr. Borneman's direct supervisor.

Up until this time, Principal had still not implemented an official limitation on market timing trading. Mr. Borneman had only been asked to voluntarily comply with Principal's request not to engage in such trading. On June 14, 2001, Chris Bowman, Joni Tibbetts, and Natalie Bachman held a meeting with Plaintiff to discuss his market timing trading. At the meeting, Joni Tibbetts indicated that "this issue is very serious and I mentioned it's gotten the attention of quite a few people in the company." She also indicated that "[i]t's up to you to decide if you want to continue to do this. Certainly the system is going to allow you to choose up to $30,000 but there are other issues ... again, the choice is yours, Brian." At the meeting, Chris Bowman made the following comments: "I told you I may not be able to sit idly by, I'm just shocked, dismayed, disappointed at your response to the situation and frankly, I just don't understand it;" "we have a different set of expectations for [customers'] behavior than we do for people who take a paycheck from Principal and represent our customers;" "I think it's only appropriate for us as your management to tell you, that I think it's hard, it's very hard for me to estimate the damage you have done to your own reputation and to your career potential here at Principal with the way you've handled this. Like Joni said, your name is being spoken in some of the highest offices in our heart of this company and it's not in favorable light;" "I think you have some decisions to make. One being, can you salvage what's left of what is going on here because of this. You have some ground to make up absolutely;" "We're talking about your ca-

reer Brian, not your short-term dealing inside this ... If you hope to have a future at Principal, this needs to stop." "This discussion is not about rights, it's about responsibilities as an employee of Principal. You can choose to disagree with that. But you're making a big choice about your future." At the meeting, Mr. Borneman was informed that, effective immediately, he would be officially limited to $30,000 per day in trading and that he would be fired if he failed to adhere to the policy.

Immediately after the June 14 meeting, plans were made to remove Mr. Borneman from the demutualization project on which he was working. The decision to take him off the project was made by Chris Bowman and Joni Tibbetts. After the meeting, Colleen Schumacher e-mailed Sheri Hasan and Joni Tibbetts and asked for clarification on why Mr. Borneman was being pulled from the demutualization project. She indicated that "[w]e want to avoid the perception that we're coming down on him for performance as a result of the market timing situation." In response to this concern, Bachman responded, "When I told Brian that he would not be on the project anymore, I did say that it was because of what had transpired this morning. It's not the market timing but rather how he is handling it as an employee of the company."

The day after the June 14 meeting, Natalie Bachman e-mailed human resources indicating that she wanted to put Mr. Borneman on written warning because of his pattern of taking personal time off without clearing it with her first. She stated in the e-mail that she wanted to put Mr. Borneman on written warning immediately, but indicated that "[m]y concern is making sure we handle this appropriately given the market timing issues and wanting to keep that and the performance issues separate."

On August 2, 2001 Tina Berg sent an e-mail to Colleen Schumacher discussing the upcoming meeting that Natalie Bachman was planning to have with Mr. Borneman. In it, she indicated that she "explained ('cautioned') that it is very important that the performance issues are kept very separate for [sic] the market timing situation. He is being held to the same performance standards as others in the same position. Natalie again confirmed they would move this fast with anyone. They expect a lot from these folks and can not really spend too much time with poor performance."

On August 2, 2001 Natalie Bachman sent an e-mail to Sheri Hasan, Joni Tibbetts, Chris Bowman, Colleen Schumacher and Tina Berg indicating that Mr. Borneman had taken his concerns "high into HR." She also indicated that "he is saying that the performance issues are all retaliation for the market timing. He has presented a good case to HR as to why he feels this. Tammy [DeHaai] knows that this person does not have the full story, but from their angle, what Brian is saying has some merit."

Chris Bowman was informed on October 15, 2001 that a reduction in force was being contemplated and that new budget proposals would need to be submitted by October 21, 2001. In conjunction with this reduction in force, Chris Bowman's staff created a document titled "Bowman Staffing" that was printed on Oct. 24, 2001. The document indicated that one employee was on final warning. That employee was Brian Borneman. However, Mr. Borneman was not placed on final warning until October 29, 2001.

On or before November 2, 2001, Mr. Borneman was placed on a downsizing tracking log. In November, Donna Schecher, who replaced Natalie Bachman in September 2001 as Mr. Borneman's direct supervisor, and Sheri Hasan were given responsibility to decide who would be downsized in the product development department. They were told they had to eliminate one employee. After Mr. Borneman was placed on final written warning on October 29, 2001, Sheri Hasan created a document that talks about a plan to fire Mr. Borneman under the reduction in force, and it indicates that this plan came from Joni Tibbetts. Around November 15, 2001, Mr. Borneman received a letter from Principal human resources indicating his employment would be terminated as of November 30, 2001.

### a. Price Waterhouse *analysis*

The Court finds, upon examining the evidence and making all reasonable inferences in Plaintiff's favor, that a reasonable factfinder could conclude that market timing trading, an illegitimate criterion, was a motivating factor in Plaintiff's termination and in his negative performance evaluations, both formal and informal. The Court also finds that, upon conducting a similar examination of the evidence in the context of Plaintiff's interference claim, a reasonable factfinder could conclude as well that a specific intent to prevent Plaintiff from exercising his right under the employee benefit plan to engage in market timing trading motivated at least some of Defendant Principal's adverse performance reviews and threatening remarks regarding Plaintiff's career at Principal. The evidence permits an inference that Plaintiff was asked to discontinue *all* market timing trading, even though trading up to $30,000 per day was still authorized under the Plan even after the computer restriction was imposed in early June of 2001. It is not a significant logical leap from there to infer that at least some of the negative performance reviews that the Plaintiff received were intended to intimidate him into changing his market timing trading practices and to dissuade him from exercising his right under the Plan to en-

gage in market timing trading up to $30,000.

Under the law of the Eighth Circuit, "not every prejudiced remark made at work supports an inference of illegal employment discrimination." *Rivers–Frison*, 133 F.3d at 619. The Circuit has distinguished between comments that demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions from stray remarks in the workplace or statements made by non-decisionmakers. *Id.* The Court finds that the comments reflected in the evidence detailed above linking Plaintiff's job performance and his market timing trading were all made by individuals who were closely involved in the process of evaluating Brian's job performance and deciding upon his ultimate termination: Chris Bowman, Joni Tibbetts, Sheri Hasan, and Natalie Bachman as Plaintiff's supervisors and superiors, and Colleen Schumacher and Tina Berg as human resources employees charged with supporting the Product Development department. Thus, none of these comments can be dismissed as stray workplace remarks.

Since the parties cross-moved for summary judgment, the Court must also examine whether summary judgment is appropriate in favor of Plaintiff on the retaliation and interference claims. The Court finds that it is not. The overall effect of the evidence presented by both parties is to place into complete dispute the very issue most critical to deciding Plaintiff's claim: Principal's motives in negatively evaluating Plaintiff's performance and ultimately terminating him. Although a reasonable factfinder could conclude that Principal's adverse employment actions taken against Plaintiff were motivated by a desire to retaliate for market timing trading or to chill or stop

market timing trading, when the evidence is examined in the light most favorable to the Defendant, the opposite finding is also plausible. Accordingly, the Court denies Plaintiff's cross-motion for summary judgment on this claim.

### b. McDonnell Douglas *analysis*

To establish a prima facie case of retaliation under § 1140, a claimant must show the existence of a causal connection between participation in a statutorily protected activity and an adverse employment action. *Kinkead v. Southwestern Bell Telephone Co.*, 49 F.3d 454, 456 (8th Cir. 1995). The Court has already discussed evidence that supports the conclusions that Plaintiff was engaged in a statutorily protected activity and that he suffered adverse employment action. The Court now finds that Plaintiff has presented evidence sufficient to support the conclusion that a causal connection existed between his market timing trading, the statutorily protected activity, and the adverse employment actions to which Plaintiff was subjected. The Court bases this finding on the facts discussed above, as well as on circumstantial evidence that the timing of the adverse employment actions taken against Plaintiff followed very closely his discussions with management in which they attempted to dissuade him from market timing trading. In supporting a prima facie case under *McDonnell Douglas,* circumstantial evidence is appropriate. *Kinkead,* 49 F.3d at 456. Defendant Principal attempts to argue that the delay of seven months between Plaintiff was first asked to stop trading and when he was ultimately terminated precludes drawing an inference of retaliation. In support of this proposition, Defendant has cited cases in which the U.S. Supreme Court and the Eighth Circuit have held that temporal proximity between an adverse employment action and employer's knowledge of protected activity

must be very close in order to sustain an inference of retaliatory motive. *See Clark County School District v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close."); *Rath v. Selection Research, Inc.,* 978 F.2d 1087, 1090 (8th Cir.1992). However, Defendant ignores the fact that between the initial conversation with management about market timing trading in April 2001 and his ultimate termination in November 2001, Plaintiff engaged in other exchanges with his supervisors and management about his trading in which displeasure was expressed at its continuation. Defendant also ignores the fact that Plaintiff's termination is not the only adverse employment action at issue. For example, the performance review which preceded Plaintiff being placed on written warning occurred very soon after the June 14, 2001 meeting in which Plaintiff was confronted by Bowman, Hasan, Tibbetts, and Bachman about continuing to engage in market timing trading. In addition, Plaintiff's case does not rest only on this circumstantial evidence of temporal proximity between the protected activity and the adverse action.

Once Plaintiff has established a prima facie case of retaliation, the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the adverse action. *Id.* at 456. Here, Defendant has presented evidence that it was Plaintiff's poor job performance, as evidenced by performance evaluations both before and after the market timing trading began, that ultimately led to his being selected for downsizing in the RIF.

Once the employer proffers a legitimate, nondiscriminatory reason for the adverse action, the burden shifts back to Plaintiff to prove that the proffered reason is pretextual. Here, the same evidence that Plaintiff offered to support the prima facie case also could lead a reasonable factfinder to conclude that the Defendant's explanation is pretext, and that the true reason that Plaintiff was negatively evaluated and eventually fired was because he engaged in market timing trading, in accordance with the terms of the Plan, but to the extreme displeasure of Principal's management.

Because the evidence is not so one-sided as to permit a reasonable factfinder to reach only one conclusion, the court denies both Defendant and Plaintiff's motion for summary judgment on retaliation under the *McDonnell Douglas* theory.

To establish a prima facie case of interference under § 1140, a claimant must demonstrate a causal connection between the likelihood of future benefits and an adverse employment action. *Kinkead,* 49 F.3d at 457. Here, it is undisputed that the Plaintiff had the right to engage in unlimited market timing trading until a formal restriction was introduced by Principal in June of 2001. After that time, Plaintiff continued for the duration of his employment to be entitled to engage in market timing trading up to $30,000 per day. In support of the causal connection, the Court finds that the evidence discussed above suffice to establish a prima facie case of interference for Plaintiff.

As with retaliation, the Defendant has indicated that its adverse actions can be explained by Plaintiff's poor job performance. In order to overcome an employer's legitimate, nondiscriminatory explanation, a plaintiff under § 1140 is required to present evidence that an employer acted with specific intent to interfere with their rights. *Jefferson v. Vickers, Inc.,* 102 F.3d 960, 964 (8th Cir.1996). The same evidence that supports the inference

of a prima facie case of interference also supports a conclusion by a reasonable factfinder that Defendant acted with specific intent to interfere with Plaintiff's rights under the Plan. For the reasons discussed above with respect to retaliation, the Court denies summary judgment to both Plaintiff and Defendant on this claim. There is a genuine dispute regarding Principal's motives in taking adverse employment actions to permit the Court to decide as a matter of law and without the benefit of seeing and hearing the witnesses testify that the evidence will permit only one conclusion. The Court's job on summary judgment is not to weigh evidence, but simply to determine whether there are genuine disputes as to material facts.

### F. Failure to Supply Plan Documentation

Plaintiffs have asserted three theories under which they seek recovery for Defendants' failure to provide Plaintiff Brian Borneman with certain plan documentation.

#### 1. *Failure to furnish copies of Plan documentation: 29 U.S.C. § 1024(b)(4)*

 The first is straightforward. 29 U.S.C. § 1024(b)(4) provides that the plan administrator must, "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract or other instruments under which the plan is established or operated." If the administrator fails to comply with such a request within 30 days, the court is authorized to award damages to such participant or beneficiary

in the amount of up to $100 a day from the date of such failure or refusal, or order other such relief as the court deems proper. 29 U.S.C. § 1132(c)(1)(B). Defendants concede that Plaintiff made a written request for Plan documentation on August 27, 2001,[9] and again on November 27, 2001, and that the Plan document was not provided to him until November 28, 2001. Thus, it is undisputed that Defendant's violated § 1024(b)(4). Summary judgment is therefore granted to Plaintiff.

Although the issue of whether to impose a penalty can properly be decided on summary judgment where there is no dispute about the underlying facts, *see, e.g., Rodriguez–Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580, 588–89 (1st Cir.1993); *Tucker v. General Motors Retirement Program,* 949 F.Supp. 47, 56–57 (D.Mass. 1996); *First Atlantic Leasing Corp. v. Tracey,* 738 F.Supp. 863, 876 (D.N.J.1990), the Court in this case reserves until after trial a decision about the amount of the penalty to be imposed, if any, as there is a genuine and material dispute regarding the bad faith of Defendants in failing to provide the documentation. This Court has previously held that "[w]hen determining penalty amounts under § 1132(c), courts may look to factors such as bad faith, or lack of control, on the part of the administrator, and prejudice or harm to the participant, but the existence of those factors is not a prerequisite to the imposition of liability." *Brown v. American Life Holdings, Inc.,* 64 F.Supp.2d 882, 891 (S.D.Iowa 1998) (citations omitted). Defendants argue that their failure to furnish the documents was not the result of bad faith, but mere confusion on the part of the plan administrator as to what Plaintiff was requesting in his August 27, 2001 e-mail.

---

**9.** In an e-mail to Colleen Schumacher, Plaintiff wrote, "Please provide me with copies of

the plan document, booklet, and contract."

Plaintiff counters with evidence that indicates the plan administrator was instructed from above to give Mr. Borneman a "general response" to his e-mail request for documents. Although the Court questions the strength of Defendants' evidence about confusion, the Court's role at this stage is not to weigh the evidence, but merely to ascertain whether there are genuine disputes as to material fact.

Additionally, Defendants argue that the Plaintiff was not prejudiced by the failure to provide the documents, as he already had a specimen copy of the Group Annuity Contract before he made his request for Plan documentation. The Plaintiff has provided no evidence of how the specimen copy of the GAC differed from the GAC that actually controlled his plan, nor has he shown any concrete evidence regarding how he was injured by the failure of Defendants to provide written copies of the Plan documentation he requested. Thus, the only issue remaining for trial regarding the penalty to be imposed is whether Defendants acted in bad faith in failing to provide Plan documentation.

### 2. Failure to make Plan documents available: 29 U.S.C. § 1024(b)(2)

Plaintiffs also argue that Defendants violated 29 U.S.C. § 1024(b)(2) by failing to make copies of Plan documentation available in the office of the administrator. However, the Court finds that there is no evidence to support the conclusion that Defendants failed to make copies of the documentation described in § 1024(b)(2) available to the Plaintiff in Principal's offices. Plaintiff never asked to view such information in Principal's offices. Rather, he requested, pursuant to § 1024(b)(4), that copies of the documents be provided to him. Thus, any remedy available to Plaintiff falls under § 1024(b)(4).

### 3. Failure to provide other "information" under 29 U.S.C. § 1132(a)(1)(B)

Plaintiffs' final argument regarding documentation is a three-step argument: 1) § 1132(c)(1)(B) permits damages "for an administrator's failure to provide information when the participant relies on a section other than § 1024(b)(4)." See Brooks v. Metrica, Inc., 1 F.Supp.2d 559, 565 (E.D.Va.1998) (citing Crotty v. Cook, 121 F.3d 541 (9th Cir.1997) and Davis v. Liberty Mut. Ins. Co., 871 F.2d 1134, 1139 (D.C.Cir.1989)); 2) in violation of their fiduciary duty under § 1104, Defendants failed to provide certain "information" to Plaintiff Brian Borneman related to the market timing trading restriction and materially misrepresented certain information about the trading restriction to Plaintiffs; 3) since this failure to provide "information" occurred under § 1104, a provision other than § 1024(b)(4), § 1132(c)(1)(B) applies and Plaintiffs should be able to recover a statutory penalty of up to $100 per day for the nondisclosure of Plan information which resulted from Defendants' violation of fiduciary duty.[10] The Court rejects this argument as a matter of law. Even if this did constitute a breach of fiduciary duty, there is no remedy under § 1132(c)(1)(B) for such violation. The Court acknowledges that there is case law that supports the idea that penalties under § 1132(c)(1)(B) can be triggered by an oral request for information where the plan administrator is required to give the participant information under another provision of ERISA. See, e.g., Crotty v. Cook, 121 F.3d 541 (9th Cir.1997); Brooks v.

---

10. "Any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary ... may in the court's discretion be personally liable to such participant or beneficiary ..." 29 U.S.C. § 1132(c)(1)(B).

*Metrica, Inc.,* 1 F.Supp.2d 559, 565 (E.D.Va.1998). Those cases, however, can be distinguished from the one currently before this Court. In each case, the provision under which the Plan was required to provide information to the participant or beneficiary specifically enumerated with great specificity the information to be provided. In *Brooks,* the Court held that the penalty provision of § 1132(c)(1)(B) was triggered by Plaintiff's oral inquiry about why his claim for benefits was denied where § 1133 requires a plan to provide adequate notice to a participant or beneficiary whose claim for benefits has been denied, setting forth the specific reasons for denial. 1 F.Supp.2d at 565–66; 29 U.S.C. § 1133. In *Crotty,* the Court held that the Plaintiff's oral request for a summary plan description, which Plaintiff was entitled to receive without any request within 90 days of becoming a participant in the Plan under § 1024(b)(1), was sufficient to trigger the penalty provision of § 1132(c). The *Davis* Court similarly allowed damages under § 1132(c) for a Plan's failure to supply a summary plan description to the plaintiff, as mandated by § 1024(b)(1).

In contrast, § 1104, which details the fiduciary duties of an ERISA fiduciary, does not specifically enumerate particular information that a fiduciary must provide to participants and beneficiaries. Rather, the duty to disclose certain information to participants has been developed in case law interpreting § 1104. *See, e.g., Shea v. Esensten,* 107 F.3d 625 (8th Cir.1997) ("the duty of loyalty requires an ERISA fiduciary to communicate any material facts which could adversely affect a plan member's interests"). The Court finds that it would distort the purpose of § 1132(c)(1)(B), which provides for a stiff daily penalty for nondisclosure of information where such disclosure is specifically mandated under the terms of ERISA, to allow its penalty provision to be applied to requests for information required to be disclosed under § 1104, where the disclosure requirements are not specifically mandated within the text of the statute.

### III. ORDER

Summary judgment is partially granted for Defendants as detailed herein. Plaintiff's motion for summary judgment is granted on the issue of failure to provide plan documentation under 29 U.S.C. § 1024(b)(4). Issues remaining for trial include portions of Plaintiffs' claims for recovery of benefits under the Plan, breach of fiduciary duty, retaliation and interference, failure to supply plan documentation, and penalty amount, if any, under § 1132(c)(1)(B).

IT IS SO ORDERED.